tracks upon which trains are run should work under a red flag, or that a flag-man should be stationed at either end of that gang, no matter how large or small it may be? A. You want my opinion of the rule? Q. Yes. A. I think it would be a very good idea. It would be safe for men that is working on the road. Q. Do you think, in view of your experience, that men can be properly protected from passing trains without such a uniform rule? A. Why, no."

Appropriate objections were made to the questions as well as motions to strike out the answers thereto. The objections were overruled, and the motions denied and exceptions duly taken. The witness was not an expert. There was nothing to indicate that he had particular skill in the management and operation of a railroad of this character. It was, at most, a mere expression of opinion or a guess upon his part that a rule of the kind and character of the one suggested might be "a very good idea," and that workmen could not be protected without such a rule. Manifestly such expressions or conclusions are not the evidence which the law requires in order to justify a verdict that a defendant has been remiss in its duty in not promulgating or enforcing a rule for the protection of servants in its employ.

Upon both grounds, therefore, I am of the opinion that the judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

INGRAHAM and LAUGHLIN, JJ., concur. O'BRIEN, P. J., and CLARKE, J., dissent.

---

### BOWERS v. MALE et al.

(Supreme Court, Appellate Division, First Department. January 26, 1906.)

1. INSURANCE—CREDIT GUARANTY COMPANY—ILLEGAL USE OF FUNDS—PURCHASE OF STOCK—DIRECTORS—PERSONAL LIABILITY.

It being necessary to increase the reserve of a credit insurance company, a new corporation was organized by the insurance company's officers and directors, designated as the "Reserve Company," which, in consideration of a transfer of certain shares of the insurance company's stock, agreed to furnish such additional reserve. An amount of stock in the reserve company equal to the amount so required to be paid to the insurance company was subscribed by the reserve company's stockholders, after which they, as officers and directors of the insurance company, procured the latter to purchase the same. *Held*, that such purchase constituted an unlawful exercise of power on the part of such officers and directors and a wrongful use of the insurance company's funds, rendering such officers and directors as participated therein individually liable for the loss sustained.

2. CORPORATIONS—RESOLUTIONS—CONFIRMATION OF CONTRACTS.

A resolution, passed by the stockholders of a corporation, approving and confirming all the acts of the board of directors and its executive committee for the preceding year, did not constitute a ratification of a fictitious loan made by the corporation, nor of a purchase by it of certain stock in another corporation which was not disclosed at the meeting.

Houghton, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by John M. Bowers, as receiver of the Mercantile Credit Guarantee Company of New York, against William H. Male and

others. From a judgment in favor of plaintiff on a referee's report, defendants appeal. Affirmed.

The report of Referee Hamilton Odell is as follows:

I, Hamilton Odell, to whom by order of court made herein on the 24th day of January, 1900, it was referred to hear and determine the issues in this action, do respectfully report: That before proceeding to hear the testimony I was sworn as prescribed by section 1016 of the Code of Civil Procedure. That the parties, with their counsel, have attended before me, and I have heard the proofs and arguments submitted by them respectively, and that upon such proofs I do find the following facts: First. The Mercantile Credit Guarantee Company was a corporation organized under the insurance law of the state of New York on or about December 1, 1892, with a capital stock of $250,000, divided into 2,500 shares of $100 each, payment of which was completed in or about December, 1894. The business of said company consisted of guarantying or insuring merchants against excessive and unlooked for losses.

Second. Prior to December, 1894, the company had been required by the insurance department of Ohio, as a condition of doing business in that state under the terms of the Ohio insurance law, to maintain a surplus or reserve equal to 50 per cent. of the premiums on the insurance in force at the end of each year, at which time it was required to make its annual report. The same demand was also made by the insurance authorities of other states, but not by the authorities of the state of New York. The company was not able to comply with this demand. For the purpose of satisfying the requirements as to reserve of the states referred to, a plan was devised to reduce its capital stock, which in those states was treated as a liability, and to create a surplus or reserve fund to be made up in part by the conversion of $50,000 of its capital into surplus, through the retirement and cancellation of an equal amount of stock, and by raising a further sum of $50,000 in cash. This plan was sanctioned by the stockholders of the company at a special meeting held December 5, 1894, when resolutions were adopted which provided, among other things, that the 500 shares of the company's capital stock representing the amount of such reduction should be canceled through the reserve company, or such other parties as might present such stock for cancellation, and which authorized the officers and directors of the company to enter into a contract with the reserve company, or other parties, for the purpose of establishing a surplus fund of $100,000 on such terms as by the directors might be determined to be for the best interests of the company. Another resolution adopted at the same meeting provided as follows: "Resolved that the board of directors be, and they are hereby, authorized and instructed at their pleasure, and whenever they deem it to be to the interest of the company to do so, to purchase, or buy, from any source obtainable, stock of the Reserve Company of New York, at a price not above the par value of said stock, and the money used in the purchase of said stock shall be deducted from the reserve or surplus of this company over and above its capital: and further, that the money used in such purchase shall be deducted from the amount of this company's said surplus, and the stock so purchased shall not appear as an asset of the company. All dividends declared or payable on said stock, until the agreement between the two companies is canceled, shall be collected and placed to the credit of the expenses of the company."

Third. On or about December 28, 1894, the Reserve Company was organized as a business corporation under the laws of New York, with a capital of $100,-000 for the purpose of providing a reserve for the Mercantile Credit Guarantee Company. Its directors were at all times directors of said Mercantile Company.

Fourth. On December 31, 1894, an agreement was made between the Mercantile Credit Guarantee Company and William Bro Smith, which recited the authority given by the stockholders at their said meeting of December 5th, and a proposal from Smith and its acceptance by the company, and by which Smith agreed to pay to the company $50,000 in shares of its full paid stock, which should be canceled by the company upon delivery, whereby the capital stock of the company should be reduced by that sum, the money represented

by such canceled stock to constitute part of the surplus of the company, and also the sum of $50,000 in cash, as follows: $17,000 on or before March 1, 1895; $17,000 on or before July 1, 1895; and $16,000 on or before October 1, 1895. In consideration of these payments of stock and cash, the company agreed to pay to Smith or his assigns, the sum of $1 for each $1,000 of insurance in force on the books of the company at its home office in New York on the 1st day of January, 1895, and on each succeeding 1st day of January during the continuance of the contract, such payments to be made in equal monthly installments on the 1st day of each month in the year next succeeding the 1st day of January on which they were figured. It was mutually agreed that the contract should continue until the company should give notice that after six months it would pay to Smith or his assigns $125,000 in cash, and on such payment the company should have the right to terminate the contract, and Smith and his assigns were given the right or privilege to take $100,000 of the company's stock, instead of the $125,000 in cash. It was further agreed that, in case of the dissolution of the company during the continuance of the contract, Smith, his executors, administrators, or assigns should be entitled to share and receive on such dissolution one-third of the funds divisible among the stockholders of the company after payment of all debts and obligations, provided that, if any part of the $100,000 specified to be paid by Smith should at the time of the dissolution remain unpaid, the amount payable to Smith should only be in proportion as the amount paid should bear to the full paid capital stock of the company. And it was further provided and agreed that the said Smith, his executors, administrators, and assigns should only be entitled to that proportion of the said $1 per thousand as the amount paid should bear to the said $100,000 until the said $100,000 should be fully paid, and that a failure on the part of the said Smith, his executors, administrators or assigns to pay the said $100,000 at the time and in the manner specified in the said agreement should only operate "to forfeit the right to the said payment in said proportion."

Fifth. On January 10, 1895, an agreement was made between the said Smith and the Reserve Company by which, in consideration of the issuance to Smith of the entire full paid capital stock ($100,000) of the Reserve Company, Smith assigned to that company his above-mentioned contract with the Mercantile Credit Guarantee Company and all rights and privileges therein or thereby granted to him, and the Reserve Company agreed to save and hold the said Smith harmless from any and all liability under said contract, and to procure from the Mercantile Credit Guarantee Company a release to Smith of all obligations on his part under said contract and an acceptance of the Reserve Company as principal in his place. On the same day a further agreement was made between Smith and the Reserve Company and the Mercantile Credit Guarantee Company, whereby the latter company did release Smith from all liability under said contract and did accept the Reserve Company as principal in place of Smith.

Sixth. The entire capital stock of the Reserve Company was issued to Smith in consideration of the assignment to that company of his said contract with the Mercantile Company, and was thereafter reassigned by Smith to the Reserve Company in consideration of that company's said agreement to carry out his part of said contract and to hold him harmless against his obligations thereunder.

Eighth. On and prior to January 28, 1895, the several stockholders of the Mercantile Company delivered to the Reserve Company 20 per cent. (amounting to 500 shares) of their holdings of stock of the Mercantile Company, and received therefor an equal number of shares of stock of the Reserve Company. The said 500 shares of the Mercantile Company's stock was then surrendered by the Reserve Company to the Mercantile Company in part performance of the Smith agreement and were canceled.

Ninth. Prior to July 9, 1895, the Reserve Company had been able to sell or dispose of only one share of its stock outside of the 500 shares so issued in exchange for stock of the Mercantile Company, which one share was purchased for $100 by Charles Cohn, who was not an officer or director of either company.

Tenth. The reduction of the capital stock of the Mercantile Company as above set forth did not increase its surplus sufficiently to enable it to report the

necessary reserve to Ohio and other states.  The time to make such report was extended by Ohio and Illinois to July 10, 1895.  In order to enable the company to continue to do business in those states, it became necessary for it to exhibit to the insurance authorities, at or about the expiration of the extended term, a report showing the existence of a surplus or reserve fund at least $30,000 larger than the surplus or reserve actually held by the company.  The Reserve Company had failed to pay to the Mercantile Company the $17,000 of cash provided by the said Smith contract to be paid on or before March 1, 1895, and also the $17,000 provided to be paid on or before July 1, 1895. Its failure to make such payments was caused by its inability to dispose of its stock.  In this situation five of the defendants, to wit, Deen, Male, Bach, Herzig, and Smith, who then were, and who thereafter during all the times referred to in these findings continued to be, directors of the Mercantile Credit Guarantee Company, the defendant Deen being also president, and the defendant Smith being also secretary, of said company, subscribed between them for and took 300 shares of the Reserve Company's stock, and paid the Reserve Company therefor the sum of $30,000.  Male subscribed $10,000 and took 100 shares, and each of the others subscribed $5,000 and took 50 shares.  They borrowed from the Phenix National Bank the money to pay their subscriptions. On July 9, 1895, the Reserve Company paid to the Mercantile Company, on account of the amount payable under the Smith contract, the $30,000 received from said five defendants, and on the same day the Mercantile Company deposited said sum in the Phenix National Bank and took from the bank therefor a certificate of deposit "payable on the return of this certificate to the order of the officers of said company duly approved by three of the following:  W. H. Male, Siegmund J. Bach, Leopold Herzig, William M. Deen, and C. Vincent Smith."

Eleventh. At and during all the times referred to in these findings, the defendants Deen, Male, Smith, and Hinckley were members of the executive committee of said Mercantile Company.  Herzig became a member of said committee on July 11, 1895, and Bach prior to February, 1896.  The defendants Hinckley, Berry, and Fitzgerald were also during said times directors of said company.

Twelfth. No certificates for the 300 shares of stock above mentioned were issued by the Reserve Company to the said five subscribers until September 9, 1895.  After the payment to the Mercantile Company, on July 9th, of the said $30,000 satisfactory reports, showing the required surplus or reserve, were made by that company to Ohio and Illinois.

Thirteenth. On or about August 1, 1895, the directors of the Mercantile Company authorized and directed the officers of the company to purchase at a price not above par $5,000 of the stock of the Reserve Company.  On September 5, 1895, the officers were in like manner authorized and directed to purchase, at the same price, $10,000 of said stock.  On October 3, 1895, the officers were in like manner authorized and directed to purchase $15,000 of said stock. Under these resolutions the officers purchased at par of the defendants Deen, Male, Herzig, Bach, and Smith the 300 shares which they had subscribed for and taken as stated in the preceding tenth finding; payment therefor being made by the Mercantile Company by checks on the Phenix National Bank. With these checks were paid the moneys borrowed by said defendants from the bank on July 9th.

Fourteenth. The Mercantile Company was required to make its annual report to the western states showing a sufficient surplus or reserve on January 1, 1896.  It was not in a condition to do so.  It had received no payment from the Reserve Company on account of the Bro Smith contract since the payment of $30,000 on July 9th, and the Reserve Company was entirely without means to make any further payment.  Under the stockholders' resolution of December 5, 1894, the 300 shares of Reserve Company stock above mentioned did not constitute an asset of the Mercantile Company.  They were not marketable, and had no market value, and were not available in computing the company's surplus.

Fifteenth. On December 30, 1895, the defendants Male, Deen, Bach, Herzig, and Smith purchased the 300 shares of Reserve Company stock held by the

Mercantile Company, and paid therefor the sum of $30,000, which they borrowed from the Phenix National Bank for that purpose. For said sum the bank issued to the Mercantile Company a certificate of deposit payable to the order of the company "approved by either three of the executive committee, W. H. Male, S. J. Bach, L. Herzig, W. M. Deen, J. W. Hinkley, and C. Vincent Smith."

Sixteenth. The purchase referred to in the last preceding finding was an absolute purchase. The 300 shares became the absolute property of the purchasers, and the $30,000 paid therefor by them became the absolute property of the Mercantile Company. There was no agreement on the part of the Mercantile Company to repurchase the stock, nor, so far as appears, was there any understanding among the purchasers that the stock should afterwards be sold back to the company. But the proofs show that they individually expected that by subsequent action of the Board of Directors, of whom they were a majority, the company, or the officers of the company, would be authorized to buy back the stock from them under the authority conferred by the said stockholders' resolution of December 5, 1894.

Seventeenth. The said five defendants purchased the said 300 shares of Reserve Company stock on December 30, 1895, for the purpose of increasing the reserve or surplus of the Mercantile Company, so that it might make satisfactory reports to the insurance departments of Ohio and other western states, and thus be enabled to continue to do business in those states. They knew that the said stock had no market value and was not in fact worth the sum they paid for it.

Eighteenth. On February 5, 1896, at a meeting of the board of directors of the Mercantile Company, at which the defendants Deen, Bach, Herzig, Berry, and Smith were present, and the defendant Male was not present, the following resolution was adopted: "Resolved that the officers of the company be, and they are hereby, authorized and directed to purchase, at a price not above par, $30,000 of the stock of the Reserve Company, in accordance with the authority and instructions given by the stockholders at their meeting of December 5th, 1894."

Nineteenth. On March 3, 1896, the 300 shares of Reserve Company stock referred to in the fifteenth finding were owned by the defendants Deen, Male, Bach, Herzig, and Smith, all of whom were then directors of said Mercantile Company and members of the executive committee; the said Deen being the president, and the said Smith being the secretary, of said company. On that day, in pursuance of the resolution set forth in the eighteenth finding, they and the defendant Berry procured the Mercantile Company to purchase from them the said 300 shares and to pay them therefor the sum of $30,000 in cash belonging to the Mercantile Company. The transaction was disguised under the form of a demand loan to the said Berry, who was the brother-in-law of the defendant Deen, and a man of small means, secured by the said 300 shares as collateral, and was so entered on the Mercantile Company's books, and Berry made and delivered to the Mercantile Company his note for $30,000, payable to the company's order on demand, and received from the company its check for $30,000, which he at once transferred to the defendant Deen, who collected the same, and with the proceeds paid off the loans made by the bank to him and his associates when they purchased the 300 shares on December 30, 1895. In fact, no loan was made by the company to Berry. On or about October 27, 1896, entries were made on the company's books for the purpose of winding up the supposed loan, by indicating the purchase at that date from Berry, for $30,000, of 300 shares of the Reserve Company stock, which appeared to be held by the company as collateral. No money or stock passed at that time, and Berry was not a party to that transaction. The purpose of the defendants in so disguising the real nature of the transactions was to keep outstanding on the company's books an appearance of assets to the amount paid over to the five directors.

Twentieth. On March 4, 1896, at a meeting of the executive committee of the Mercantile Company, at which Bach, Male, Herzig, Deen, and Smith were present, a resolution was adopted authorizing a demand loan to Oliver F. Berry of $30,000, secured by stock of the Reserve Company.

Twenty-first. Of the 300 shares of Reserve Company stock purchased by the Mercantile Company on the 3d of March, 1896, 100 shares belonged to the defendant Male, and 50 shares to each of the other four directors, Deen, Bach, Herzig and Smith. On that day the defendants Male, Bach, and Herzig approved or indorsed the certificate of deposit mentioned in the fifteenth finding, by which the Mercantile Company was enabled to obtain from the bank the moneys with which to purchase from them and their two associates the said 300 shares of stock. The sale on March 3, 1896, of the said 300 shares by the said five directors to the Mercantile Company was an absolute sale, and the Mercantile Company thereby became the absolute owner of said shares, having paid therefor to or for the account of the said five directors the full sum of $30,000.

Twenty-second. The above-mentioned contract between the Mercantile Company and William Bro Smith, of which the Reserve Company was the assignee, represented the entire capital stock of the Reserve Company. The Reserve Company had not at any time any asset or property except the said contract and its rights thereunder, and on the 22d day of February, 1896, was indebted to the Mercantile Company in the sum of $19,600 on account of the sum of $50,000, which, by the terms of said contract, was to be paid to the Mercantile Company in cash.

Twenty-third. From an early date in the career of the Mercantile Company its business steadily declined. The amount of risks in force constantly diminished, and the income derived by the company from premiums of insurance decreased correspondingly. Its working capital was always insufficient, and efforts to increase it were made, but without success. Its cash balances diminished. Judgments were recovered against it, and to pay such judgments and its other expenses it was obliged to and did borrow money and sell securities. For a long time prior to its failure its directors, including the defendants, had been engaged in efforts to sell out its business to another company.

Twenty-fourth. The stock of the Reserve Company had not, when the said five directors sold it to the Mercantile Company on March 3, 1896, any market value. It was not available as collateral on which to borrow money. It did not become or constitute an asset in the hands of the Mercantile Company, and was not treated by the officers or directors of that company as an asset, and it had no value beyond the amount of the annual payment which, under the terms of the Bro Smith contract, the holders thereof were entitled to receive, and which at the time the 300 shares were purchased from the said defendants amounted to about 5 per cent. on the basis of the company's business on January 1, 1896, but which from that time declined, so that by the end of that year the rate had diminished to about 4 per cent. After the purchase of said 300 shares in March, 1896, the Mercantile Company received, as dividends thereon, the sum of $1,241.67. This element of value ceased when the company failed in March, 1897.

Twenty-fifth. The directors of the Mercantile Company, who, on February 5, 1896, authorized and directed the purchase of the $30,000 of the stock of the Reserve Company, and the five directors who afterwards sold the said 300 shares to the Mercantile Company, knew that said shares had no market value, or any value beyond the sums which might be paid to the holders thereof under the Bro Smith contract, as mentioned in the twenty-fourth finding, and that the said 300 shares were not worth the sum of $30,000 to the Mercantile Company or to any other party, and that it was not to the interest of the Mercantile Company to purchase the said 300 shares and pay therefor the sum of $30,000 in cash out of its treasury. They knew for what consideration the entire capital stock of the Reserve Company had been issued, and of what the property and assets of that company consisted, and of the condition of the business and affairs of the Mercantile Company, and of the unsuccessful efforts that had been made both to increase its working capital and to sell out its business to another company. In authorizing and directing and completing the said purchase, the said directors did not consider or take into account the interests of the Mercantile Credit Guarantee Company, but (with the assistance of said Berry) the five directors who owned the 300 shares procured the purchase to

97 NEW YORK SUPPLEMENT

and 131 New York State Reporter

be made from themselves by said Mercantile Company, not for the purpose of benefiting that company or for the furtherance of its interests, but for the purpose of taking off their hands stock for which they had paid par and which they had no good reason to believe had, and which in fact had not, any intrinsic value.

Twenty-sixth. The purchase by the said directors of the said 300 shares of Reserve Company stock was a wrongful and illegal use and investment of the funds of the Mercantile Company, and the sale to the company by the defendants Deen, Male, Bach, Herzig, and Smith of the said 300 shares was, under the circumstances narrated in the preceding findings, a violation of their duty as directors of said company, and a wrongful and unlawful exercise of the power possessed by them as such directors, whereby grave injury was done to the company, its creditors, and stockholders.

. Twenty-seventh. At a meeting of the directors of the Mercantile Company on November 5, 1896, at which all of the defendants, except Fitzgerald, were present, the president reported that in pursuance of a resolution of the board of February 5, 1896, under authority given by the stockholders at their meeting of December 5, 1895, he had purchased 300 shares of the Reserve Company's stock at par, and, on motion, the action of the president in the purchase of said stock was ratified and approved.

Twenty-eighth. The next meeting of the stockholders of the Mercantile Credit Guarantee Company following the aforesaid purchase of 300 shares of Reserve Company's stock was held February 4, 1897. The president of the company (the defendant Deen) read a report relating to the company's business which contained no allusion to the fictitious Berry loan hereinbefore mentioned, or to the purchase of the 300 shares of Reserve Company's stock, and did not enumerate the said stock among the assets and property of the company or otherwise, and no information in regard to said loan or purchase or in regard to the said Reserve Company's stock was given to the meeting. The resolutions of the executive committee and of the board of directors relating to the Berry loan and the purchase of the stock were not brought before the meeting or mentioned. A resolution was passed by the meeting in the following terms: "Resolved that all acts of the board of directors and its executive committee for the past year, be approved and confirmed." The number of shares represented at that meeting by their holders in person or by proxy was 1362, out of a total of 2,000 shares outstanding. The stockholders present included the defendants Male, Bach, Smith, and Deen, and held 234 shares. The other shares were all voted by proxy, and, with the exception of 85 shares, all the proxies were held and voted by the defendant Deen and the counsel for the company. Of the 1,362 shares voting at the meeting, 787 were held by the defendants herein as follows: Male 40, Hinckley 560, Bach 80, Herzig 40, Berry 11, Fitzgerald 8, Deen 40, Smith 8. The resolution passed by the meeting recited above did not in fact relate to or constitute any approval or ratification of the Berry loan or of the purchase of the 300 shares of Reserve Company's stock hereinbefore referred to.

Twenty-ninth. By the purchase of 300 shares of Reserve Company's stock hereinbefore referred to and the loss and injury thereby sustained by the Mercantile Credit Guarantee Company, and by the illegal, improvident, and wrongful conduct of the defendants as hereinbefore stated, the said company, its stockholders, and creditors have suffered damage to the amount of $28,758.33 and interest from March 3, 1896, no part of which has been paid.

Thirtieth. The defendant Fitzgerald did not unite with the other directors either in authorizing the purchase of the said 300 shares of Reserve Company stock or in approving or ratifying the said purchase, and he was not in any way interested in the said stock.

Thirty-first. The defendant Hinckley was not interested in the said 300 shares of stock or in the purchase thereof, and had no part in or connection with the purchase thereof on March 3, 1896, beyond voting at the directors' meeting on November 5th to approve said purchase.

Thirty-second. On or about August 3, 1897, the people of the state of New York commenced an action in the Supreme Court in the county of New York

against the Mercantile Credit Guarantee Company, alleging, among other things, that prior to August 1, 1897, the superintendent of insurance department of the state of New York caused to be made an examination of the condition and affairs of the defendant and its books, papers, and vouchers, and upon such examination the said superintendent became and was satisfied that the defendant had become insolvent and unable to pay its debts, and it was further alleged that the defendant was unable to pay its debts as they became due and was insolvent, and judgment was demanded dissolving the defendant corporation and forfeiting its corporate rights, privileges, and franchises, and that upon the dissolution of the defendant a permanent receiver of its property and assets be appointed with all the rights, duties, and liabilities of permanent receivers in such cases, and that an injunction issue in accordance with the prayer of the complaint, and for other relief. Thereafter the defendant appeared in the action and offered in writing, by its attorney duly authorized thereto, to allow judgment to be taken against it by the plaintiff for the relief demanded in the complaint. Such offer was accepted in writing by the plaintiff, and thereafter a judgment was duly entered in the action August 5, 1897, whereby, among other things, it was adjudged and decreed that the defendant be, and the same was, thereby dissolved and its corporate rights, privileges, and franchises forfeited, and that a fair and just distribution of the property thereof and of the proceeds thereof, among its fair and honest creditors in the order and in the proportion prescribed by law, be had, and the plaintiff herein, John M. Bowers, was appointed receiver of all the property, things in action, and effects, real and personal, of the said corporation, and of all the property held by it, with the usual powers and duties enjoyed and exercised by receivers, according to the practice of the court and of the statutes in such case made and provided, and he was required to execute and file with the clerk of New York county a bond in manner and form prescribed by the judgment for $40,000. The said receiver thereafter qualified by filing the bond as required by said judgment, and became and is vested with all the property, things in action, and effects, real and personal, of the said company, and is entitled to maintain this action.

Thirty-third. The liabilities of the Mercantile Credit Guarantee Company, as adjusted, are about $328,000, on account of which the holders of policies of insurance issued by said company have been paid about 25 per cent. of their claims and the other creditors have been paid about 6 per cent. of their claims. The only other assets with which to pay these liabilities, apart from the claim in this suit, and in other suits brought by the receiver, amount to between $17,000 and $18,000, and, if all the suits which the receiver is pursuing should be decided in his favor, the amount recovered, together with the other assets, would not be sufficient to pay the debts of the company in full.

And upon the foregoing facts I do find and decide as conclusions of law, as follows:

First. The plaintiff is entitled to have judgment in this action against the defendants William M. Deen, William H. Male, Siegmund J. Bach, Leopold Herzig, C. Vincent Smith, and Oliver F. Berry for the sum of $28,758.33, with interest from March 3, 1896, together amounting at the date hereof to the sum of $42,059, and for his costs and disbursements herein.

Second. The defendants Hinckley and Fitzgerald are entitled to have judgment herein against the plaintiff, as receiver, dismissing the complaint of the plaintiff upon the merits, with single costs. And I direct that judgment be entered hereon in accordance with such conclusions.

The plaintiff having moved, prior to the final submission of the case, to amend his complaint to conform to the proofs, without prejudice to proceedings theretofore had, the said motion is granted, and paragraph fourth of the complaint is amended so as to read as follows: "On information and belief, that on or about March 3rd, 1896, said defendants, acting as directors of said company, the defendants Deen, Hinckley, Fitzgerald and Smith being also officers of said company, authorized, directed and procured the purchase by the said company of 300 shares, of the par value of $30,000, of the capital stock of the Reserve Company, a corporation organized and existing under the laws of the state of New York, which shares so purchased belonged to and

were purchased from the defendants Male, Bach, Herzig, Deen and Smith; and that the said defendants authorized, directed and procured the payment of $30,000, funds and moneys of the Mercantile Credit Guarantee Company of New York, to the defendants Male, Bach, Herzig, Deen and Smith for the said shares so purchased."

Argued before O'BRIEN, P. J., and INGRAHAM, McLAUGH-LIN, HOUGHTON, LAUGHLIN, and CLARKE, JJ.

W. J. Curtis, for appellants.
G. Zabriskie, for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion of the referee.

HOUGHTON, J., dissenting.

---

### FULLER BUGGY CO. v. WALDRON et al.

(Supreme Court, Special Term, Albany County. February 20, 1906.)

**1. Costs—Term Fees.**

Where no proof was offered before the county clerk that plaintiff noticed the cause for trial and was thereby estopped from denying that the same was necessarily on the calendar for a particular term, during which he filed an amended complaint, it was improper for the court to tax a term fee for that term, over plaintiff's objection that the case was not then at issue.

**2. Same—Witness'. Fees.**

Where it did not appear that certain codefendants were subpoenaed to appear at a term at which the case was not tried, defendant was not entitled to tax witness' fees for such defendants' appearance at that term.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Costs, § 717.]

**3. Same.**

Witness' fees may be properly allowed to parties to the action who are subpoenaed and compelled to attend as witnesses.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Costs, § 724.]

**4. Same—Pleadings—Personal Service—Disbursements.**

Disbursements for personally serving the answer, amended answer, and an order on the opposing attorney should not be allowed, in the absence of proof that personal service was necessary in order to obtain a speedy trial or to otherwise protect the interest of a client.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Costs, § 702.]

Action by the Fuller Buggy Company against Adelbert Waldron and others. On motion for retaxation of costs. Granted.

See 94 N. Y. Supp. 1017.

N. B. Spalding, for plaintiff.
Jas. A. Leary, for defendants.

KELLOGG, J. 1. A term fee for the Warren term, held in June, 1905, was taxed. From the affidavits filed with the clerk upon taxation, it appears that the action was not tried at the June term because not at issue; the plaintiff having served an amended complaint after the notice of trial. Although asserted in the defendants' brief, it does